ELIZABETH MORAINVILLE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HARRIET ELWOOD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 102140, 102141. Promulgated March 26, 1942.

*Thomas Howell Scott, Esq.*, for the petitioners.
*Martin M. Lore, Esq.*, for the respondent.

754

OPINION.

STERNHAGEN: 1. The petitioners seek to avoid the deficiency and to establish error of their own returns and consequent overpayment, upon the ground primarily that in carrying out its "Plan for the Rearrangement of Capitalization" the Heywood-Wakefield Co. accomplished a statutory reorganization and that the receipt by them in 1936 and 1937 of series B shares was therefore tax free.

Without discussion, it may be adopted as true that there was a recapitalization, and that this was a statutory reorganization, as provided in section 112 (g) (1) (D), Revenue Act of 1936. But not every receipt by a shareholder as a direct or collateral incident of a reorganization is tax free; only such are tax free as are covered by the express terms of the statute. This must be obvious; for a dividend in unlike shares or in bonds is a recapitalization, but no one would contend that the receiving shareholder may therefore omit the dividend from his income.

The petitioners argue that to them the result of the rearrangement was the substitution of six shares of series B first preferred and 75 cents cash for each share of second preferred. This, they say, is an exchange described in section 112 (b) (3),[1] and they refer to the doctrine that a stock dividend is not taxable if it works no change in the corporate entity or in the stockholder's proportional interest. They conceive of the cash dividend, the one share dividend of 1936, the one share dividend of 1937, and the exchange of 1937 as together constituting an integrated recapitalization; and upon that postulate they urge that the two shares received by express dividend are not taxable. They raise no question as to the propriety of treating the cash dividend as taxable, and the Commissioner has not disputed the nontaxability of the four shares received in exchange; only the taxability of the two share dividends is in issue.

In ascertaining the character of the steps of the plan and performance, it is of the utmost importance that its terms should be read rather than the narrative description which was sent to the stockholders with the plan itself; for it is the plan itself which was put in operation and determines the legal effect. The "Plan

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(b) EXCHANGES SOLELY IN KIND.—

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

for the Rearrangement of Capitalization", dated October 23, 1936, provides as to the existing second preferred stock, as follows:

The Plan further contemplates that a stock dividend of two shares of $25 par value Series B First Preferred Stock be declared on each share of Second Preferred Stock outstanding and, also, a cash dividend of $0.75.

A holder of Second Preferred Stock will, also, be offered four shares of Series B First Preferred Stock in exchange for a share of Second Preferred Stock.

In assenting to the Plan the holder of Second Perferred Stock will agree to accept the stock and cash dividend in full satisfaction of arrears in dividends accumulated to December 1, 1936, and further agrees to exchange his Second Preferred Stock for Series B First Preferred Stock at the ratio of four shares of Series B First Preferred to one share of Second Preferred.

This is a clear provision for dividends of cash and two shares in satisfaction of the existing arrears on second preferred shares which had theretofore been recited as $50.75 per share, and for an exchange of one second preferred share for four new series B shares. The provision was carried out to the letter.

No significance can, therefore, be given to the fact that, in sending the plan to the shareholders and urging them to assent, the president of the corporation undertook to give them a condensed statement of its effect upon them in which he said:

SECOND PREFERRED STOCK

The holders of Second Preferred Stock will receive for each share of stock and its accumulated dividend rights six shares of Series B 5% Cumulative First Preferred Stock, $25 par value, and Seventy-five Cents in cash.

In general parlance this is a correct statement, but it can not be taken as proof that the plan was for an integrated exchange rather than for dividends in discharge of the arrears and an exchange of one for four; even though to a shareholder who had assented the ultimate effect may have been the same. *Estate of C. T. Grant*, 36 B. T. A. 1233, 1246; *H. Y. McCord*, 31 B. T. A. 342; *Edison Securities Corporation*, 29 B. T. A. 483; affirmed on this point, 78 Fed. (2d) 85.

Petitioners cite *Commissioner* v. *Kolb*, 100 Fed. (2d) 920; *Helvering* v. *Leary*, 93 Fed. (2d) 826; *Helvering* v. *Schoellkopf*, 100 Fed. (2d) 415; *Commissioner* v. *Whitaker*, 101 Fed. (2d) 640; and *Commissioner* v. *Food Industries, Inc.*, 101 Fed. (2d) 748. Those opinions are distinguishable. Preferred dividends in arrears were discharged by the issuance of new stock in a reorganization. The issuance of the shares, although in satisfaction of the arrears, was not pursuant to the declaration of a dividend. It was held that it could not be treated as a dividend and was not taxable as such to the receiving shareholders. It was clearly intimated, however, that if the shares had been issued in payment of a previously declared dividend it would have been taxable as such. This intimation was fortified by the

holding in each of the opinions that the cash dividend of 50 cents, which was paid pursuant to an express dividend declaration, was taxable as a dividend even though it was an incidental part of the general reorganization. The latter holding requires the decision here that each of the dividends of 75 cents and of one series B share in 1936 and one in 1937 which were paid pursuant to an express dividend declaration, is taxable as such. This view has been more recently followed in *South Atlantic Steamship Lines*, 42 B. T. A. 705; *Skenandoa Rayon Corporation*, 42 B. T. A. 1287; affd., 122 Fed. (2d) 268; certiorari denied, December 22, 1941; *J. Weingarten, Inc.*, 44 B. T. A. 798; on review, C. C. A., 5th Cir.; and *Humphryes Manufacturing Co.*, 45 B. T. A. 114. The petitioners treated these dividends as such in their returns, and there is no reason why this should be changed.

Petitioners, although arguing that the entire arrangement was an integrated reorganization, argue also that since the entire six shares and cash which they received represented the same interest in the corporation as was represented by their former holding of second preferred, the theory of a true nontaxable stock dividend is applicable. The argument necessarily falls with the rejection of the conception of unification, since it can not be said that the entire six shares took the place of the original one share as the result of either a stock dividend or an exchange. After the dividends of each of the two shares, the shareholders continued to hold their original second preferred shares and thus they were in a position of having the new and different series B shares added to the second preferred shares already held. Certainly during the period of this holding the second preferred shareholders were in no position to argue that the share dividends brought them no change of interest. The nontaxable stock dividend theory is inapplicable.

2. The petitioners on their returns used a value of $20.50 a share for the dividend of 1936 and of $14.50 a share for the dividend of 1937. The Commissioner determined the values at $21.50 and $20.50, respectively, and the petitioners have undertaken to prove the determination too high. Both parties have introduced opinion evidence and argue upon the corporation's books of account. The respondent proved sales of similar shares and bid and asked quotations, all within periods near enough to have significance. Upon all of this evidence the respondent's determination of value must be upheld. The values have been found as facts.

3. The petitioners make an alternative contention that the share dividend received in 1936 was only partly taxable because it was only partly distributed out of earnings and profits accumulated after March 1, 1913, and that the dividend received in 1937 was to no extent taxable because there were no such earnings and profits from

which it could be distributed. The finding is requested that available earnings and profits were $653,741.94, and it is urged that only to this extent is the 1936 dividend taxable to the shareholders, the rest ($217,733.56) and all of the 1937 dividend being distributions of capital and not taxable. This proposition is founded on an historic "analysis" of the accounts in an attempt to show that the book surplus of $2,080,746.23 on December 31, 1935, does not represent earnings and profits and that instead of a surplus available for dividends, there was in fact a deficit of *$1,744,256.87*. This reduction is made to appear by showing items other than earnings and profits which in past years have been written into surplus, and other items which have been written out of surplus. But the analysis is too superficial to make it clear that these adjustments prove that the earnings and profits are less than enough to support the 1936 and 1937 dividends of series B shares.

It is important to remember how this issue arises. The taxpayers included these dividends in the income shown on their returns at the respective amounts of $20.50 and $14.50, making no claim to exclusion because of the inadequacy of earnings and profits as a source of distribution. The Commissioner raised the valuation to $21.50 and $20.50, respectively. The petition assails the valuation and complains that the Commissioner failed to determine that any part of the dividends represented a return of capital. It contains no specification of items of surplus which the Commissioner improperly determined, and thus the issue is not narrowed to any particular transaction or book entry. The book surplus is on its face ample for the dividends. That the distribution did represent a return of capital, petitioners undertake to prove by a tabulation of certain items of inclusion and exclusion of surplus the net result of which would show a deficit of earnings. To support the contention that book surplus of 1936 does not reflect earnings and profits accumulated since March 1, 1913, but represents something else, the analysis shows that during the intervening period adjustments were made in the surplus account which superficially appear to have no effect on earnings and profits. See Ascertainment of "Earnings or Profits" for the Purpose of Determining Taxability of Corporate Distributions; Paul, Selected Studies in Federal Taxation, Second Series.

In 1933 common stock par was reduced from $6,000,000 to $1,500,000 and the difference was put in surplus. However, in 1921, by a stock dividend, $3,000,000 of surplus had been capitalized. Petitioner would have it held from this that the difference of $1,500,000 which is reflected in the existing surplus must be excluded as other than earnings and profits. But the bare statement of the transfer of the amount in 1933 from capital stock to surplus is not

enough to prove the point. See *Foster* v. *United States*, 303 U. S. 118.

In earlier years, $2,100,000 was restored to surplus as excessive depreciation which had been improperly written off. This restoration to surplus was part of an amount of $3,004,360.26 restored as "plant restoration" in 1920. Another "part" of the $3,004,360.26 was an amount of $1,978,958.38 set up as good will, of which the entire amount was charged off in 1930. These two items of $2,100,000 and $1,978,958.38 obviously can not be regarded as components of the $3,004,360.26. If, as is plausible, $2,100,000 has remained in the surplus account as the restoration of earnings and profits which had before 1920 been improperly charged off as depreciation, the result would be an amount of available earnings and profits sufficient to support the present dividends.

Between 1927 and 1935 the company paid for some of its own preferred shares and realized a profit of $1,279,583.80, which apparently has a place in the surplus, and petitioners would have it excluded from the available earnings. It appears only that the shares were purchased and ultimately retired. It is entirely possible that the amount is within earnings and profits from which taxable dividends may be distributed. *Commissioner* v. *Young Corporation*, 103 Fed. (2d) 137; *Allyne-Zerk Co.* v. *Commissioner*, 83 Fed. (2d) 525.

These several items prevent the conclusion that any part of the 1936 and 1937 dividends was from "capital" instead of earnings and profits; and the imposition of tax upon them as dividends in their entirety is sustained.

*Decision will be entered for the respondent.*